RECEIVED

MAY 2 8 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

ANITA ABLESON SLIMAN, ET AL                  CIVIL ACTION NO. 04-637

VERSUS                                       JUDGE DOHERTY

OCCIDENTAL PETROLEUM CORP, ET AL.            MAGISTRATE JUDGE METHVIN

## MEMORANDUM RULING DISMISSING PLAINTIFFS' COMPLAINT

Plaintiffs, Anita Ableson Sliman, Kelly Ableson Henagan, Jessica Erin Bush, Kirby Michael Bush, and Patrick Ryan Bush, (collectively, "plaintiffs")[1] who are the children and grandchildren of Mr. Paul Ableson and Mrs. Catherine Ableson, have asserted a claim pursuant to the Employee Retirement Income Security Action of 1974 ("ERISA") against Occidental Petroleum Corporation ("Oxy")[2] and Aetna Life Insurance Company (Aetna), arising out of Aetna's payment of benefits to Mrs. Martha Ableson, who was married to Mr. Paul Ableson when he died on May 21, 2002.

The court has carefully considered the parties' pleadings, all briefing, the administrative record and the applicable law. For the reasons that follow, the court finds the claims administrator's decision to pay benefits to Mrs. Martha Sliman upon the death of Mr. Paul M. Sliman was not legally incorrect and otherwise not an abuse of discretion. Accordingly, plaintiffs are not entitled to the relief requested, and it is ORDERED plaintiffs' claims be DENIED and DISMISSED with PREJUDICE.

---

[1] The interests of the ERISA claimants Anita Ableson Sliman, Kelly Ableson Henagan, Jessica Erin Bush, Kirby Michael Bush, and Patrick Ryan Bush are in alignment, and they are represented by the same counselor who filed this action on the behalf of the plaintiffs collectively. Consequently, for the purpose of discussion, this Court refers to the claimants collectively as "plaintiffs."

[2] On November 8, 2006, Oxy was dismissed by joint motion [Docs. 39, 42].

## PROCEDURAL HISTORY

On March 12, 2004, Aetna removed this matter to the United States District Court for the Western District of Louisiana before Chief Judge Richard Haik [Doc. 1]. The matter was stayed by Chief Judge Haik from July 12, 2005, through November 8, 2006, pursuant to a joint motion to stay the proceeding pending a remand to exhaust administrative remedies under ERISA. [Docs. 36, 37, 38, 42] to complete the administrative process. On November 20, 2006, Judge Haik reassigned this matter to this Court [Doc. 43]. On March 9, 2007, after the parties advised the administrative record was complete, the parties submitted the administrative record and their Briefs on the Merits for this Court's consideration [Doc. 45, 46, 47].

## FACTS

This Court has reviewed the record, including the briefs on the Merits filed on behalf of the parties. In addition, this court has reviewed the Administrative Record filed into the record by Aetna. Based upon that review, this Court finds that the facts relevant to this matter are as follows.

In the latter part of the 1970s, Paul M. Ableson was an employee of Cities Service Companies [Cities]. Through Cities, Mr. Ableson was insured under a group life insurance plan under two policies, "7072" and "7072D," issued by Equitable Life Assurance Society [Equitable].[3] On or about October 9, 1978, Mr. Ableson executed an Equitable Assignment form indicating he assigned to his wife, Catherine L. Murphy Ableson:

> all of his right, title, claim, interest and benefit which he now has or hereafter may have in and to the **insurance on his life under Group Policy Nos. 7072 and 7072D or any Group Policy in re-placement thereof, issued by the Equitable Life Assurance Society (herein the Company),** to Cities Service Company and all amendments thereof and contracts supplementary thereto or that may be made in

---

[3] Plaintiffs' brief, p. 3; Defendant's brief, p. 4.

connection therewith (all of which are herein collectively called the Policy), and all of his right, title, and interest in and to any contract of life insurance, to which the group life insurance hereby assigned shall be converted pursuant to the terms of said Policy (herein called the Converted Policy), with right of said Assignee to any and all claims, authorities, rights, benefits, elections, options, privileges, rights, title, advantages and interest therein and thereunder to be had or derived therefrom, subject to the conditions of the Policy and to the **regular rules and regulations of the Company.**[4]

On October 9, 1978, Mrs. Catherine Ableson subsequently executed a designation of beneficiary form naming herself as the primary beneficiary and her daughters, Cathy A. Bush, Anita A. Sliman, and Kelly A. Hanagan, as secondary beneficiaries under the Equitable policies 7072 and 7072D.[5] On or about August 27, 1981, Catherine Ableson died.[6] On January 1, 1982, Mr. Ableson retired.[7]

In 1984, Occidental Petroleum Corporation (Oxy) acquired Cities. Oxy subsequently changed insurance policy carriers from Equitable to Aetna and contracted with Aetna to fund the Oxy group life insurance plan (the "Oxy Plan" or the "Plan").[8] Mr. Ableson was thus insured through the Oxy plan under Aetna Group Policy Number 397390.[9] The Aetna policy language notes

---

[4] Administrative Record 093-096 (emphasis added). Regarding the assignment, Equitable and Cities "assume no obligation as to its validity or sufficiency, and do not pass upon its legality." Administrative Record 096.

[5] Administrative Record 095, 103.

[6] Plaintiffs' Brief, p. 3; Defendant's Brief, p. 4; Administrative Record 083. A September 28, 1982 letter from Equitable to Cities indicates, "It is our understanding that Mrs. Ableson died intestate and the State of Louisiana divided her estate: one-half to Mr. Ableson (the insured) and one-half to the three children. The children now wish to reassign their one-half share to Mr. Ableson." Administrative Record 086-088.

[7] Administrative Record 007.

[8] Administrative Record 004-009.

[9] *Id.*

-3-

the Aetna policy "replaces and supercedes any prior coverage," including any plan of group life insurance carried or sponsored by a "Participant Employer (or its predecessor)" and underwritten by Aetna "or any other insurer which has been replaced entirely or in part;" however, "if an employee or his beneficiary becomes entitled to claim under such prior coverage," his insurance under the Aetna policy "shall be cancelled, as of its effective date," and "any premiums paid" shall be refunded to the policy holder.[10] Pursuant to the Aetna Policy, which constitutes "the entire contract" between Oxy, its Employees and Aetna,

> No assignment of any present or future right of interest, under this policy by the Policyholder or by any Participant Employer shall bind the insurance company without its written consent.

> Neither the employees nor their beneficiaries may assign any of the insurance or other benefits under this policy, provided, however, that if the policy holder and the Insurance Company consent in writing, the employee or his assignee may, as a gift, transfer by absolute and irrevocable assignment all of his incidents of ownership and all of his other right, title and interest both present and future....

> No assignment shall be binding upon the Insurance Company unless the assignment meets the foregoing conditions and requirements, is in form approved by the Insurance Company, and/or a duplicate thereof is filed with the Insurance Company at its Home Office in Hartford, Connecticut.

> Neither the Insurance Company nor the Policyholder guarantees or assumes any obligation as to the validity, sufficiency, or effect of any assignment.[11]

Further, the Aetna policy provides that beneficiaries shall be paid upon the death of the covered employee according to "terms of this policy." Specifically, "any amount payable to a beneficiary shall be paid to the beneficiary or beneficiaries designated by the employee...."[12]

---

[10] Administrative Record 038.

[11] Administrative Record 047.

[12] Administrative Record 037, 049

According to the Aetna summary of benefits:

> When you become eligible for this Plan, you will be asked to designate a beneficiary(ies). You may name anyone as your designated beneficiary, and you may change your beneficiary designation at any time by completing the proper form.[13]

Moreover, Aetna is a "named fiduciary" of Oxy, the Plan Administrator, and under the Oxy Plan, Aetna is also designated the Claims Administrator vested with "complete authority to review all denied claims for benefits under the Plan."[14] Likewise, Aetna has "discretionary authority to determine eligibility for benefits under the Plan." In exercising its fiduciary responsibilities, Aetna "shall have discretionary authority to determine whether and to what extent covered Plan participants and beneficiaries are eligible for benefits, and to construe disputed or doubtful Plan terms."[15] Under the Oxy Plan, Aetna "shall be deemed to have properly exercised such authority unless it has abused its discretion hereunder by acting arbitrarily and capriciously."[16]

On July 23, 1986, Aetna provided a letter in response to a request from Oxy regarding previous "Metropolitan" and Equitable assignments with respect to the Oxy Plan.[17] As to the "Metropolitan" assignments, Aetna indicated the language in the assignments, "anticipates a change of insurance carriers" as the text states, "... or under any Group Policy or Certificate hereafter issued in substitution therefor...." On the other hand, Aetna advised the Equitable assignments did not anticipate a change of insurance carriers insofar as the Equitable text states, "... or under any Group

---

[13]   Administrative Record 057.

[14]   Administrative Record 059 , 062.

[15]   *Id.*

[16]   *Id.*

[17]   Administrative Record 052-053.

Policy in replacement thereof underline issued by the Company" to Cities.[18]  According to Aetna, the "reference to replacement policies relates to policies **issued by Equitable** and not to policies issued by another insurance carrier."[19]

Aetna additionally advised in the 1986 letter it "will accept all of the Equitable assignment forms provided they are attached to one of our Notice forms which must be fully completed and signed by an employee and assignee."[20]  Aetna further indicated it did not know how the Internal Revenue Service would view the Equitable assignment, "due to the fact that the underlying Equitable assignment form does not appear to be anticipatory."[21]  Aetna identified three alternatives under the circumstances: (1) employees could "send in the Aetna Notice form with the Equitable and/or Metropolitan assignment attached to it and also complete a new Aetna assignment form to the same assignee, using Aetna's anticipatory assignment form;" (2) employees could "complete only the Aetna Notice form and submit along with the Equitable and/or Metropolitan form;" and (3) employees could "complete a new Aetna assignment form."[22]

On May 14, 2001, Mr. Ableson executed a Change of Prior Designation under the Aetna Policy, designating his current wife, Martha Ableson, as the primary beneficiary and his daughters

---

[18]  *Id.*

[19]  *Id.* (emphasis added).  In the 1986 letter, Aetna advised Equitable assignments were of two varieties: (1) those which indicated the assignments related to policies issued by "the Company," which is identified in the assignments as Equitable, and (2) those which specifically identify Equitable.  *Id.*  It appears Mr. Ableson's assignment is of the latter variety insofar as his assignment specifically identifies policies issued by Equitable.  See Administrative Record 083.

[20]  *Id.*

[21]  *Id.*

[22]  *Id.*  There is no evidence or argument Mr. Ableson took any action following the 1986 Aetna letter, other than submitting a Change of Prior Designation under the Aetna Policy in 2001.

Cathy Bush, Anita Sliman, and Kelly Hanagan, as "contingent" beneficiaries under the Aetna Policy.[23]

On May 21, 2002, Mr. Ableson died.[24]  Thereafter, on July 30, 2002, pursuant to Mr. Ableson's May 14, 2001 change of prior designation wherein he named the beneficiaries, Aetna paid Martha Ableson $48,000, the total benefit due under the Aetna Policy number 397390.[25]

On January 15, 2001, counsel for plaintiffs notified Oxy that his clients were the named beneficiaries under the Equitable policies 7072 and 7072D, as Mr. Ableson had assigned the policy to his "then wife Catherine L. Ableson,"[26] who in turn named her daughters as beneficiaries under the Equitable policy.  Counsel for plaintiffs requested "how, when and by what authority" the beneficiary was changed.[27]  On January 29, 2003, counsel for plaintiffs sent a similar letter to "Glenn Springs Holdings, Inc." describing the Equitable Policies 7072 and 7072D and requesting "how, when and by what authority" the beneficiary had been changed.[28]

On February 26, 2003, Oxy responded to counsel for plaintiffs, noting the 1978 assignment assigned Mr. Ableson's "right, title, claim, interest and benefit ... in and to the insurance on his life

---

[23]  Administrative Record 008.

[24]  Administrative Record 009, 011.

[25]  Administrative Record 004-011.

[26]  Administrative Record 075-076.

[27]  *Id.*

[28]  Administrative Record 109-110.  It appears from the plaintiffs' petition in this matter that, on January 29, 2003, Ms. Cathy Ableson Bush, one of the original three daughters of the union of Mr. Paul Sliman and Mrs. Catherine L. Murphy Ableson, died.  She was survived by her two sisters, Anita Ableson Sliman and Kelly Ableson Sliman, as well as her three children, Jessica Erin Bush, Kirby Michael Bush, and Patrick Ryan Bush, who are plaintiffs in this matter. [Doc. 1, ¶¶ 1-4].

under Group Policy Nos. 7072 and 7072D;" however, in 1984, after Oxy acquired Cities, Oxy "changed insurance policy carriers from [Equitable] (Group Policy Nos. 7072 and 7072D) to [Aetna] Group Policy No. 397390." [29] Oxy explained Mr. Ableson did not assign the *Aetna* group life insurance policy, noting the prior 1978 assignment only applied to "any group policy in replacement thereof, issued by [Equitable] to [Cities]." [30] Oxy further noted Mr. Ableson's May 2001 beneficiary designation and indicated, "Aetna paid the insurance proceeds based on this Beneficiary Designation" pursuant to the Aetna policy. [31]

On February 2, 2004, plaintiffs filed a complaint for "Breach of Contract" under state law in state court [Doc. 1], noting Mr. Ableson died and "the proceeds were paid to the named beneficiary." On March 19, 2004, Aetna filed its answer, asserting among other things that plaintiffs' state law claims were preempted by ERISA. [Doc. 7]. On May 16, 2005, the parties entered a joint stipulation that ERISA preempts plaintiffs' claims. [Doc. 29].

On August 24, 2005, counsel for plaintiffs filed a claim with Aetna, seeking $100,000 in benefits under the Aetna Policy "and/or" the Equitable Policy "or any replacement/substitute policy issued by either or any other." [32] Plaintiffs generally asserted: (1) Mr. Ableson was formerly employed with Oxy (formerly Cities); [33] (2) in 1978, Mr. Ableson, who was insured by Equitable Policy Numbers 7072 and 7072D under the Cities Plan, assigned his right, title and interest under

---

[29] Administrative Record 074.

[30] *Id.*

[31] *Id.*

[32] Administrative Record 111-117.

[33] The 1986 Aetna advisory letter in this matter was sent to Cities, two years after Oxy acquired Cities.

the Equitable Policies to his then wife, Catherine Ableson, who designated her daughters as beneficiaries to the Equitable policies, "or any subsequent/substitute/replacement policy;" (3) the Claim Administrator should consider Louisiana jurisprudence on the interpretation of insurance policies indicating ambiguity in insurance policies should be construed in favor of an insured's coverage; (4) Aetna's opinion that the Equitable assignment was ineffective as to Aetna's policy is wrong; and (5) Aetna's notice of denial of benefits was arbitrary and capricious in violation of ERISA.[34]

On October 28, 2005, Aetna responded that, upon review of the claims record and plaintiffs' claim: (1) the coverage due upon Mr. Ableson's death was in fact $48,000 as opposed to $100,000; (2) Plaintiffs' claim for benefits as a result of Mr. Ableson's death under the Oxy Plan is not payable under the terms of Aetna policy 397390, which expressly provides for designation and change of designation of beneficiaries; (2) on May 14, 2001, Mr. Ableson designated his beneficiary as Martha Ableson under the Aetna Policy; (3) pursuant to the terms of the Aetna policy, Martha Ableson was paid $48,000 upon the death of Mr. Ableson; (4) Mr. Ableson's 1978 transfer assigned his rights under the Equitable Policies 7072 and 7072D to his wife, who died; (5) on September 28, 1982, following Mrs. Catherine Ableson's death, Equitable notified Cities that a "reassignment form needed to be completed as a result of Mrs. Catherine Ableson's death, but there is "no indication that this reassignment form was ever completed;" (6) when Oxy acquired Cities, Aetna "became the carrier and did not accept assignments that were completed under the Equitable Policies because same were not "anticipatory" and "cannot be applicable to coverage offered by a subsequent insurer;" (7) Aetna's position that the Equitable assignments of Equitable policies are not valid as

---

[34] *Id.*

to Aetna's policies has been Aetna's position since 1986; (8) after Aetna became the Oxy Plan

carrier, Mr. Ableson could have completed another assignment under the Aetna plan, but there is no

evidence he did so; (9) rather, Mr. Ableson executed a beneficiary designation pursuant to the Aetna

policy on May 14, 2001 naming Martha Ableson as primary beneficiary; indicating Mr. Ableson did

not consider the previous Equitable assignment to be applicable to Aetna coverage; (10) with respect

to Louisiana jurisprudence on insurance policy interpretation, Aetna relied on *Eglehoff v. Eglehoff*

*ex rel. Breiner*, 532 U.S. 141 (2001), and indicated the Louisiana Code and jurisprudence cited by

plaintiffs are preempted by ERISA and inapplicable to this claim; (11) Aetna invited plaintiffs to

submit any additional information that would help further evaluate the claim; and (12) Aetna advised

plaintiffs of their right to a review of the Claims Administrator's determination.[35]

On December 27, 2005, a review of the Claims Administrator's determination was requested

by counsel on behalf of plaintiffs, arguing: (1) plaintiffs agree the available benefit under the Aetna

policy is in fact  $48,000; (2) Aetna incorrectly analyzed Mr.  Ableson's "standing to designate

beneficiaries," as the issue is an "assignment of the ownership of the policy;" (3) upon execution of

the 1978 assignment, Mrs. Catherine  Ableson became its owner, and "she and she alone by the very

recitals of the assignment" retained rights to designate beneficiaries; (4) Aetna's position as to the

Equitable assignments is an "obviously biased, self-serving position;" (5) if there is ambiguity in the

Equitable assignment, the "burden is on the insurer and ambiguity is resolved in favor of the non-

drafter – in favor of coverage – in favor of the beneficiaries and against the insurer...;" (6) Aetna

provided inadequate notice of denial of coverage; (6) it is well settled that where federal law is silent

---

[35]  Administrative Record 120-123.

on interpretation, state law may provide the law of interpretation.[36]

On February 11, 2006, Aetna requested any additional information from plaintiffs to consider in a "continuing effort to provide a full and fair review of this claim."[37] On March 9, 2006, Plaintiffs submitted an opinion letter from Dr. William B. Clark, a "tenured PhD with Texas A&M."[38] Dr. Clark considered the Equitable Assignment and opined, "the prose is admittedly awkward and somewhat ambiguous, but (as is often the case) the punctuation is crucial and determinative of meaning."[39] He added:

> If there were no commas and the text read " ... or any Group Policy in replacement thereof issued by the Equitable," the conditions of the Assignment would seem to be obviated once a policy with another company superceded it. But this is NOT the case. Set off by commas, the phrase (albeit clumsily) refers back to the policy numbers (7072 and 7072D) by way of identifying Equitable as the issuing company. The phrase "any group policy in replacement of" that immediately precedes the disputed phrase would be therefor construed broadly to apply to "any" converted or replacement policy irrespective of the company. This is borne out by the rest of the document, which is sweeping in its assignment of rights to the Assignee and contains no indication that those rights are contingent upon continued coverage by Equitable. The document's silence in that regard is in itself significant and serves to reinforce my reading.[40]

On April 5, 2006, Aetna reviewed the additional submission and request for review, and again concluded plaintiffs' claim for benefits were not covered under the Aetna policy, noting: (1) the focus of the case is whether the 1978 Equitable assignment is binding on Aetna in determining the proper recipient of the Aetna life insurance proceeds; (2) "if that assignment is binding on Aetna,

---

[36] Administrative Record 125-128.

[37] Administrative Record 125, 129.

[38] Administrative Record 135, 150-183.

[39] *Id.*

[40] *Id.*

then Mr. Ableson would not be able to execute a valid beneficiary designation;" (3) Aetna confirmed its previous determination that Mr. Ableson's May 2001 change of beneficiaries is "certainly evidence of the understanding that he had as to whether the 1978 Equitable Assignment remained in effect and binding on Aetna," and noted plaintiffs did not address this determination in their request for review; (4) Mr. Ableson's Equitable assignment was "voided once Aetna took over administration" in 1984; (5) since no subsequent assignment was made under the Aetna policy, benefits were processed according to the beneficiary form Mr. Ableson executed under the Aetna policy; (6) as to the assignment, Aetna recited the "clear" Aetna policy language indicating no assignments shall bind Aetna without written consent; (7) Aetna's 1986 advisory letter was not "obviously biased and self-serving," but was a "common sense" letter setting forth the applicability of prior assignments on Aetna's policy, and Aetna has remained consistent since 1986 in its opinion as to the assignments; (8) although plaintiffs disagree with Aetna's position, Oxy, the Plan Administrator never disagreed; (9) the July 24, 2002 Proof of Death form submitted by the plan sponsor indicated the beneficiary was someone other than plaintiffs; and (10) Aetna paid benefits pursuant to the May 14, 2001 Aetna Policy beneficiary designation executed by Mr. Ableson.[41]

As to Dr. Clark's opinion, Aetna noted Dr. Clark opined the Equitable assignment was "somewhat ambiguous" and indicated Dr. Clark's opinion "presents a possible interpretation" of the assignment. However, Aetna explained the Equitable assignment should be considered in the "context in which it was considered" by Oxy's employees, who were told the assignment was not valid unless a reassignment was completed, and who thereafter relied on that instruction. Aetna indicated it might not appreciate the significance of the punctuation that Professor Clark discussed,

---

[41] Administrative Record 191-196.

but noted it has consistently followed its construction of the Equitable assignment language since 1986.  Aetna noted, "it would be arbitrary on Aetna's part at this point to reverse, based on the construction of one expert retained for litigation, nearly a decade of claim administration."

As to the alleged ambiguity of the Equitable assignment, Aetna noted: (1) the Equitable form makes no "reference to 'coverage' of any sort;" (2) coverage was never disputed by Aetna, which paid the benefits upon Mr. Ableson's death; (3)Aetna is aware of "no requirement that a document that is not an integral part of an insurance policy or plan be interpreted so as to favor one group of claimants over another;" (4) Aetna did not draft the Equitable assignment and never agreed to be bound by it; and (5) Oxy employees were instructed as to the validity of the assignments, and Aetna "has always administered claims in accordance with those instructions."[42]

## APPLICABLE STANDARDS OF REVIEW

### A.    ERISA Standards of Review

It is not disputed that this matter comes before the Court by way of the Employees' Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*.  All parties agree the plan at issue is governed by ERISA, which preempts plaintiffs' claims under state law.  All parties agree the plan at issue was administered by Aetna, which was granted discretionary authority to interpret the plan's provisions and also to determine eligibility for coverage and benefits.

ERISA provides an employee benefit plan beneficiary the right to challenge the denial of a benefit claim by way of a "civil action" brought by a "participant or beneficiary" to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.  29 U.S.C.§ 1132(a)(1)(B) (West 2007).

---

[42] *Id.*

ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators. *Bratton v. National Union Fire Insurance Company of Pittsburg, PA,* 215 F.3d 516, 521-22 (5th Cir. 2000); *Firestone Tire and Rubber v. Bruch,* 489 U.S. 101, 115.

"[A] denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bratton, supra* at 521; *Firestone, supra* at 115. "When an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one of abuse of discretion." *Bratton, supra* at 521 n.4; *Firestone, supra* at 115. When, as here, the language of the plan grants discretionary authority to an administrator to interpret the plan and determine eligibility for benefits, a court will reverse an administrator's decision only for abuse of discretion. *See High, supra* at 576 (*citing Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.,* 168 F.3d 211, 213 (5th Cir.1999)); *Bratton, supra; Firestone Tire and Rubber, supra.*

In applying the abuse of discretion standard, a Court must analyze whether the plan administrator acted arbitrarily or capriciously." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.,* 168 F.3d 211, 214 (5th Cir.1999). A decision is arbitrary "when made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Laine v. UNUM Life Ins. Co. of Am,* 279 F.3d 337 (5 Cir.2002). When performing the appellate duties of reviewing decisions of an ERISA plan administrator, the district court may not engage in fact finding." *Vega v. Nat'l Life Ins. Servs., Inc.,* 188 F.3d 287, 297-299 (5th Cir.1999)(en banc). Rather, the court "need only assure that the administrator's determination falls somewhere on a continuum of reasonableness-even if on the low end." *Id.* Thus, the decision to deny ERISA benefits must be

-14-

"based on evidence, even if disputable, that clearly supports the basis for its denial." *Id.*

To determine whether an administrator's decision constitutes an abuse of discretion, a court follows a two-step process. First, the court must determine the legally correct interpretation of the plan. In answering this question, a court must consider: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan. *Wildbur v. ARCO Chemical Co.,* 974 F.2d 631, 637-638 (5th Cir. 1992).

If a court determines that the fiduciary's interpretation of the plan was not legally correct, then the second step of the *Wildbur* analysis provides a court must determine whether the plan fiduciary abused its discretion, which involves the consideration of: (1) the internal consistency of the plan under the fiduciary's interpretation; (2) any appropriate regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith. *Wildbur, supra* at 638; *Ellis, supra* at 272 n. 23; *High, supra* at 577 n. 2.

If a court determines that the fiduciary's interpretation of the plan was legally correct, "the inquiry is over, pretermitting any need to consider whether a legally incorrect interpretation of the fiduciary was not an abuse of discretion." *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 270 (5th Cir. 2004).   Conversely, a court may skip the first step of the *Wildbur* inquiry if it can determine the decision was not an abuse of discretion under the second *Wildbur* step. *High, supra* at 577.

**B.    ERISA Insurance Policy Interpretation**

One of the principal goals of ERISA is to enable employers "to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001); *see*

*also High, supra* at 566-567 (One of the underlying principles of ERISA is to ensure that employee benefits are given as promised and as expected). Uniformity is impossible, however, if plans are subject to different legal obligations in different States. *Id.* States are not free to change ERISA's structure and balance. *Boggs v Boggs*, 520 U.S. 833, 844 (1997). ERISA preempts state law governing insurance policy interpretation. *High, supra* at 578 (*citing Thibodeaux v. Cont'l Cas. Ins. Co.*, 138 F.3d 593, 596 (5th Cir.1998) ("We, like other circuits that have addressed this issue, agree that ERISA preempts state law governing insurance policy interpretation.")).

Eligibility for benefits under any ERISA plan is governed in the first instance by the plain meaning of the plan language. *Threadgill v. Prudential Securities Group, Inc,* 145 F.3d 286, 292 (5th Cir. 1998). In construing ERISA plan provisions, courts interpret the contract language "in an ordinary and popular sense as would a person of average intelligence and experience," such that the language is given its generally accepted meaning if there is one. *Wegner v. Standard ins. Co.,* 129 F.3d 814, 818 (5th Cir 1997)(internal quotation omitted); *Vercher v. Alexander & Alexander, Inc.,* 379 F.3d 222, 229 n.8 (5th Cir. 2004). The remedy for an ambiguity in a plan's language is not the compelled inclusion of all employees who arguably fit within its scope, but rather, the exercise of "interpretive discretion" by a duly empowered administrator. *MacLachlan v. ExxonMobil Corp.,* 350 F.3d 477, 482 (5th Cir. 2003).

## DISCUSSION

Although the parties agree Aetna is vested with discretionary authority under the plan, they disagree over Aetna's decision to pay benefits to Martha Ableson rather than to plaintiffs. Plaintiffs argue Aetna's decision to pay Martha Ableson benefits under the Oxy Plan upon the death of Mr. Ableson was legally incorrect and constitutes an abuse of discretion. Plaintiffs also argue Aetna's

failure to adequately notify them of its decision to deny plaintiffs benefits under the Oxy Plan constitutes arbitrary and capricious conduct.  On the other hand, Aetna argues the decision to pay Mrs. Martha Ableson benefits under the Oxy Plan upon the death of Mr. Ableson was legally correct and was not an abuse of discretion.  Aetna contends it did not fail to adequately notify plaintiffs of a denial of benefits.  As discussed more thoroughly below, this Court finds the decision to pay Ms. Martha benefits under the Oxy Plan upon the death of Mr. Sliman was legally correct and does not constitute an abuse of discretion.

I.      **Whether Aetna's Decision to pay Mrs. Martha Sliman benefits under the Oxy Plan upon the death of Mr. Sliman was legally correct.**[43]

Pursuant to *Wildbur, supra,* the factors this Court considers to determine the legally correct interpretation of the plan are: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan.  *Wildbur, supra,* 974 F.2d at 637-638.

A.      **Whether the administrator has given the plan a uniform construction**

Plaintiffs appear to argue Aetna failed to follow a uniform construction of the plan by determining Martha Ableson was entitled to the payment of benefits.  Plaintiffs contend Aetna erred in failing to recognize the validity of the 1978 Equitable Assignment.  According to plaintiffs, Mr. Ableson had no "ownership" or "standing" to direct a change of beneficiaries or reassign the Aetna

_____

[43] Because this Court finds Aetna's decision was not an abuse of discretion, as discussed below, this Court perhaps, need not consider the legal correctness of the Aetna decision, which is the threshold step of the *Wildbur* analysis.  *High, supra* at 577.  Nevertheless, this Court addresses the legal correctness of the Aetna decision for the sake of completeness and as it presents the threshold issue before the Court.

-17-

policy after the 1978 Equitable Assignment.

This argument was considered by Aetna, which on October 28, 2005, rejected the argument in reliance upon the following evidence contained in the Administrative Record: (1) the plan, which provides among other things that no assignments shall be binding upon Aetna unless approved in writing; (2) the language of the 1978 Equitable assignment, which assigns Mr. Ableson's interest under policies "7072 and 7072D or any Group Policy in re-placement thereof, **issued by the Equitable Life Assurance Society (herein the Company);**" (3) Aetna's 1986 letter discussing the Equitable Assignments that relate to policies "issued by" Equitable and providing alternatives for employees to follow should they desire the results they intended when they executed the Equitable Assignments; (4) Mr. Ableson's subsequent designation of Martha Ableson as the primary beneficiary under the Aetna Policy, which Aetna considered an expression of Mr. Ableson's belief that the assignments were no longer valid and his intent to provide benefits to his wife upon his death; (5) the Proof of Death Form submitted by Oxy on July 22, 2002, indicating the designated beneficiary was Mrs. Ableson; and (6) Aetna's February 26, 2003 letter in response to plaintiffs' counsel's request "how, when and by what authority" beneficiaries were changed.

A review of the Administrative Record reveals substantial support for a conclusion that Aetna gave the plan a uniform construction when it determined Martha Ableson was eligible for benefits upon Mr. Ableson's death. The payment to Martha Ableson is consistent with Mr. Ableson's May 14, 2001 change of prior designation of beneficiaries and also with the clear and unambiguous terms of the policy, which provides for the payment of benefits to the designated beneficiary upon the death of the insured under the plan. Moreover, there is no argument nor any evidence before this Court which establishes Aetna's decision to pay the designated beneficiary in this matter differs in any way

from its decision to pay designated beneficiaries in any similar matters under the plan.

In their December 27, 2005 request for administrative review of the October 2005 decision, plaintiffs argued Aetna's 1986 interpretation of the Equitable Assignment's efficacy under the Oxy Plan was incorrect. In support of their argument, they submitted Dr. Clark's opinion that the Equitable Assignment was "anticipatory." Aetna rejected plaintiffs' argument, noting Dr. Clark acknowledged the language in the Equitable Assignment was "awkward" and "ambiguous." Aetna explained the clear and unambiguous terms of the Aetna policy provide no assignment is binding upon Aetna unless otherwise approved in writing by Aetna. Aetna again noted the 1986 letter regarding the efficacy of the Equitable Assignment and indicated Aetna uniformly implemented the plan since the issuance of its 1986 letter. Aetna concluded it would be "arbitrary on Aetna's part at this point to reverse, based on the construction of one expert retained for litigation, nearly a decade of claim administration."

A review of the evidence on which Aetna relied reveals substantial evidence supporting its decision to pay Mrs. Ableson upon Mr. Ableson's death. Specifically, this Court notes the clear and unambiguous provisions of the Aetna policy which establish assignments are not binding upon Aetna without prior written consent of Aetna and the May 14, 2001 designation of beneficiaries which unquestionably establishes Mrs. Martha Ableson was the primary beneficiary under the Plan. This Court finds Dr. Clark's opinion simply demonstrates the 1978 Equitable Assignment form, which was neither drafted nor consented to by Aetna, contains legalese which is "awkward," "ambiguous," and perhaps subject to two different interpretations, namely that the Equitable

-19-

Assignment is (1) "anticipatory," or (2) not "anticipatory."[44]  In juxtaposition to the "awkward" and "ambiguous" language in the Equitable assignment, this Court finds of interest the clear and unambiguous terms of the Aetna policy establishing assignments are not binding upon Aetna unless approved in writing.

Accordingly, as it is not disputed Aetna is vested with discretionary authority to interpret terms of the plan and eligibility for benefits and coverage, this Court simply cannot conclude Aetna exceeded its interpretive discretion by following the clear and unambiguous terms of the plan. Additionally, insofar as there is substantial evidence supporting Aetna's decision, this Court finds no reason to depart from Aetna's well-reasoned decision that is entitled to interpretive discretion.

Additionally, Aetna also noted in its decision that Equitable requested a "reassignment" form in 1982 after Mrs. Catherine Ableson died, but that form was never completed. This Court finds of interest references in the administrative record suggesting the state divided Mrs. Ableson's interest in the assignment equally among Mr. Ableson and the Ableson daughters, who apparently desired to give their interest back to Mr. Ableson.  If this in fact happened then, assuming the 1978 assignment was effective in any sense to bind Aetna, it would seem plaintiffs' argument that Mr. Ableson has no "standing" or "ownership" to designate beneficiaries after Mrs. Ableson's death is

---

[44] It is noted that plaintiffs argue the 1978 Equitable Assignment of Policies 7072 and 7072D are "part" of the Aetna policy, relying on a Louisiana state court of appeal matter, *Mattingly v. Sportsline, Inc.*, 720 So.2d 1227 (La. App. 5 Cir. 10/28/98). As stipulated by the parties, plaintiffs' state law claims are preempted by ERISA, and this Court finds plaintiffs' reliance upon *Mattingly* and the numerous other state cases cited by plaintiffs is misplaced. Nevertheless, by way of illustration, it is noted that the decision in *Mattingly* reveals no support for a conclusion that the 1978 Equitable Assignments are "part" of the Aetna Policy. The state court in *Mattingly* considered no "assignments" of an insurance policy. Rather, the court considered "exceptions" and "endorsements," noting that, if an endorsement is "attached to the insurance policy" and the "policy and endorsement are parts of the same contract," then the "endorsement becomes part of the contract, and the two must be construed together." *Mattingly,* 720 So. 2d at 1229-1230. The clear and unambiguous terms of the Oxy Plan provides support for a conclusion the 1978 Equitable Assignment form, which Aetna neither drafted nor consented to, was not "attached to the insurance policy" nor was it "part of the contract."

undermined to the extent Mr. Ableson in fact may have received an interest in the 1978 Equitable assignment by operation of intestate succession. However, this Court need not make that finding as a matter of law, because there is substantial evidence supporting Aetna's decision to pay the designated beneficiary upon Mr. Ableson's death, as discussed elsewhere herein.

In view of the foregoing, this Court finds Aetna's decision gave the plan a uniform construction, which is supported by substantial evidence in th record.

### B.    Whether the interpretation is consistent with a fair reading of the plan

With respect to the second *Wildbur* inquiry, this Court finds substantial evidence supporting a conclusion Aetna's interpretation is consistent with a fair reading of the plan. As noted, the parties agree Aetna was vested with discretionary authority to interpret the terms of the plan and to determine eligibility for coverage and/or benefits under the Plan. Consistent with that authority, Aetna determined Mrs. Ableson was the designated beneficiary under the plan, per Mr. Ableson's designation of beneficiaries.

As discussed above, there is substantial evidence supporting Aetna's decision, including (1) the plan, which provides among other things that no assignments shall be binding upon Aetna unless approved in writing; (2) the language of the 1978 Equitable assignment, which assigns Mr. Ableson's interest under policies "7072 and 7072D or any Group Policy in re-placement thereof, **issued by the Equitable Life Assurance Society (herein the Company);**" (3) Aetna's 1986 letter discussing the Equitable Assignments that relate to policies "issued by" Equitable and providing alternatives for employees to follow should they desire the results they intended when they executed the Equitable Assignments; (4) Mr. Ableson's subsequent designation of Martha Ableson as the primary beneficiary under the Aetna Policy, which Aetna considered an expression of Mr. Ableson's

-21-

belief that the assignments were no longer valid and his intent to provide benefits to his wife upon his death; and  (5) the Proof of Death Form submitted by Oxy on July 22, 2002, indicating the designated beneficiary was Mrs.  Ableson.

Plaintiffs urge Aetna's decision is "unfair;"which was an argument Aetna considered and rejected, noting Mr. Ableson executed the May 14, 2001 change of beneficiaries which unequivocally expressed his intent for Martha Ableson receive benefits upon his death.  Aetna additionally explained that its 1986 letter thoughtfully considered the implications for Oxy employees under not only the plan but also under the Internal Revenue Code. Aetna reasoned it was not arbitrarily refusing coverage; rather, it was setting forth terms under which it would agree to administer the insurance it was providing to the Oxy Plan.  As noted above, a review of the administrative record reveals substantial evidence supporting Aetna's decision, and its decision is consistent with a fair reading of the plan and the discretionary authority with which Aetna was vested under the plan.

Additionally, as noted above, plaintiffs' argument that Mr.  Ableson had no "standing" or "ownership" to change beneficiaries as a result of  the 1978 Equitable Assignment is questionable in view of an indication in the record that Mr. Ableson  in  fact obtained an interest in the assignment by operation of intestate succession.  Of course, this Court need not rely on that indication in the record insofar as there is substantial evidence elsewhere in the record supporting Aetna's decision.

Plaintiffs additionally rely on numerous Louisiana state court decisions suggesting ambiguity must be resolved in favor of "coverage;" however, plaintiffs' reliance upon those matters is misplaced.  There is no evidence Aetna denied coverage.  Rather, the record clearly reveals Aetna paid in full the benefits payable under the plan upon notification of Mr. Ableson's death.  Further,

-22-

Aetna responded to plaintiffs' arguments that Louisiana Law and jurisprudence require a different interpretation of the Equitable Assignments under the plan.  Specifically, Aetna discussed *Egelhoff, supra*, in its October 28, 2005 decision; however, plaintiffs have never addressed the implications of *Egelhoff, supra,* in their pleadings or arguments before this Court.

Pursuant to *Egelhoff,*  one of the principal goals of ERISA is to enable employers "to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits," and such uniformity is "impossible, however, if plans are subject to different legal obligations in different States." *Egelhoff,* 532 U.S. at 148.  Likewise, as alluded to above, there is arguably some apparent confusion over what interest Mr. Ableson had in the assignment following his wife's death.  Plaintiffs' argument that the claims administrator should give effect to the 1978 Equitable Assignment arguably requires the administrator to deviate from the clear and unambiguous terms of the plan guiding the processing of claims and disbursement of benefits in favor of considering the unique implications of Louisiana Family Law and Law of Successions.[45]  This Court finds such a requirement conflicts with Congress's goal of establishing a uniform administrative scheme, as discussed in *Egelhoff.*

Moreover, as noted above, ERISA preempts state law governing insurance policy interpretation.  *High, supra* at 578 (*citing Thibodeaux v. Cont'l Cas. Ins. Co.*, 138 F.3d 593, 596 (5th Cir.1998) ("We, like other circuits that have addressed this issue, agree that ERISA preempts state law governing insurance policy interpretation.")).  To the extent plaintiffs seek to apply Louisiana

---

[45]  This Court notes that there have been at least *two* successions in the facts presented to the Court, and the plaintiffs in this matter are in fact the children and *grandchildren* of the original union between Mr. Ableson and Mrs. Catherine Ableson.  However, the particular nature of those successions is not established in the record.

law to interpret the plan, this Court finds their claims are preempted by ERISA.

Lastly, this Court finds no ambiguity in the plan, which clearly provides for the designation and payment of beneficiaries. To the extent plaintiffs suggest there is any ambiguity under the plan as a result of language found in the 1978 Equitable Assignment, this Court again notes the "remedy for an ambiguity" in a plan's language is "the exercise of 'interpretive discretion' by a duly empowered administrator." *MacLachlan*, 350 F.3d at 482. As noted above, the parties agree Aetna is vested under the plan with discretionary authority to determine eligibility for benefits and coverage as well as to interpret the terms of the plan. This Court finds substantial evidence supporting Aetna's decision, which is well reasoned.

Accordingly, in view of the foregoing, this Court finds Aetna's interpretation is consistent with a fair reading of the plan under the second *Wildbur* inquiry.

**C.     Any unanticipated costs resulting from different interpretations of the plan**.

Aetna argues the interpretation of the plan advanced by plaintiffs will result in "unanticipated costs to the Plan by creating potential new claims from other assignees of Equitable policies, and the potential for having to pay a second time to these new claimants benefits that have already been paid." In response, plaintiffs argue Aetna still has rights to recover "payment of a thing not due" against those who should not have been paid." Additionally, plaintiffs submit that, "if that is not possible or successful, that is a cost of doing business for which Aetna willingly received remuneration."

Of the competing arguments, this Court finds that set forth by Aetna more persuasive and supported by the record. Plaintiffs have submitted no evidence establishing any "deal" between Aetna and Oxy whereby Aetna assumed any obligations under the Equitable policies as a "cost of

doing business." The only substantial evidence of record establishes Aetna paid $48,000 upon Mr. Ableson's death, which is consistent with the clear terms of the plan.  This Court finds the requirement that Aetna pay an additional $48,000 under the interpretation set forth by plaintiffs would require Aetna to not only pay additional benefits but would also require Aetna to allocate resources necessary to decipher and apply language in the assignments it did not draft and did not accept.

Moreover, as noted above, Aetna would arguably be required to expend additional resources to identify what benefits are payable to whom following at least two deaths and successions under plaintiffs' suggested interpretation.  This Court finds such a result untenable in consideration of Congress's intent to establish a uniform administrative scheme.  Accordingly, under the third *Wildbur* inquiry, this Court finds plaintiffs' suggested interpretation of benefits under the plan will result in unanticipated costs from different interpretations of the plan.

In view of the foregoing, this Court finds substantial evidence in the record supporting a conclusion that: (1) Aetna's decision gave the plan a uniform construction under the first *Wildbur* inquiry;  (2) Aetna's interpretation is consistent with a fair reading of the plan under the second *Wildbur* inquiry; and (3) plaintiffs' suggested interpretation of benefits under the plan will result in unanticipated costs from different interpretations of the plan under the third *Wildbur* inquiry. Accordingly, this Court finds Aetna's decision is legally correct.

**II.    Whether Aetna's Decision to pay Mrs. Martha Sliman benefits under the Oxy Plan upon the death of Mr. Sliman was an abuse of discretion**.

As this Court finds Aetna's decision is legally correct, it need not decide whether Aetna's decision constitutes an abuse of discretion.  Nevertheless, assuming **arguendo** and only for

completeness and illustrative purposes, were this Court to have found differently as to the legal question, this Court would have found Aetna's decision not to have been an abuse of discretion.

Pursuant to *Wildbur, supra,* this Court considers three factors to determine whether the claims administrator's decision constitutes an abuse of discretion: (1) the internal consistency of the plan under the fiduciary's interpretation; (2) any appropriate regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith. *Wildbur, supra* at 638; *Ellis, supra* at 272 n. 23.

### A.    The Internal Consistency of the Plan under the Fiduciary's Interpretation;

Aetna argues its conclusion about the efficacy of the Equitable Assignment is not inconsistent with any part of the Plan, which provides for assignments of rights on forms approved by Aetna, which never approved the Equitable assignment form.  Plaintiffs have presented no argument nor any evidence of any  internal inconsistency of the plan, and this Court finds no evidence of any internal inconsistency in the plan under Aetna's interpretation upon a review of the administrative record.

As noted above, the plan clearly indicates assignments are not binding upon Aetna unless it approves of same in writing.  That clearly never happened in this matter; rather, Aetna provided written notice to Oxy as early as 1986 indicating it would not accept the Equitable Assignments and provided alternatives for employees to follow should they desire to achieve the results they contemplated when they executed the Equitable Assignments.

Aetna clearly indicated in 1986 it would honor assignments on Aetna forms, and a review of the record reveals no evidence such forms were submitted to Aetna in this matter. Aetna's presentation of alternatives for employees and its indication it would honor the employees'

-26-

assignments indicates Aetna was committed to following-through with the interests of plan participants.   Mr. Ableson clearly executed a change of beneficiaries under the Aetna policy, designating Mrs. Ableson as the primary beneficiary.   Aetna honored Mr. Ableson's expectations and followed the clear and unambiguous terms of the plan by paying in full Mrs. Ableson, the designated beneficiary, upon Mr. Ableson's death. There is absolutely no evidence that Aetna's decision in any way diminished the value of benefits it was obligated to pay upon Mr. Ableson's death.   Accordingly, there is no evidence of any internal inconsistency of the plan under Aetna's interpretation.[46]

### B.   Any Appropriate Regulations Formulated by the Appropriate Administrative Agencies;

The parties generally do not dispute much as to this point.  Aetna argues its 1986 letter was based in part on the relevant regulations under the Internal Revenue Code, namely Section 2035, which provides a "three-year contemplation" rule requiring an assignment of a life insurance policy to have existed for three years at the time of the insured's death.  Plaintiffs have presented no argument or evidence to the contrary.  A review of the 1986 letter clearly reveals Aetna's consideration of the regulations in its discussion and presentation of alternatives for employees to consider.  Accordingly, the *evidence* contained within the administrative record supports Aetna's decision, which was in consideration of appropriate regulations since 1986.

Other than the 1986 regulations relied on by Aetna, the parties have not brought to the Court's attention to any specific regulations allegedly implicated by Aetna's decision; however,

---

[46] Notably, the interpretation plaintiffs appear to advocate would result in the payment of benefits to persons who are not designated beneficiaries under the plan, which arguably would present an inconsistency under the plan that clearly provides for the payment of benefits under the plan to designated beneficiaries pursuant to the plan.

plaintiffs argue Aetna's decision was "arbitrary" because it inadequately notified plaintiffs of denial under the plan pursuant to 29 U.S.C. § 1133.[47]  This Court finds this argument without merit. Plaintiffs rely on three letters counsel for plaintiffs sent on January 15, 2003, January 29, 2003, and June 23, 2005.  According to plaintiffs, Aetna's response to those letters constitutes "arbitrary and capricious" behavior supporting an award of damages under ERISA.  Plaintiffs argue the first two letters were sent, "demanding coverage benefits be paid or denial be explained to plaintiffs."  A review of the two letters reveals they were sent to different recipients and contain no "demand" by plaintiffs' counsel. Rather, contained in both letters is a request "how, when, and by what authority" a beneficiary was changed  There is no reference to ERISA in the letters, and there is no indication in the letters that plaintiffs were "plan participants" or "beneficiaries" under the plan.

Perhaps it might be construed that letters from an attorney asking about authority to designate beneficiaries equates to an implicit "demand" for benefits under ERISA; however, this Court need not make that finding because, regardless of the characterization of the letter, Aetna responded in writing on February 26, 2003, when it explained its position with respect to the Equitable Assignments as to the Aetna Policy.  Plaintiffs allege they "stood ready to participate in the ERISA process from at least January 15, 2003 until at least August 24, 2005 – over 2 ½ years -- when finally

---

[47] 29 U.S.C. § 1133 provides:

In accordance with regulations of the Secretary, every employee benefit plan shall--

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

invoked by Aetna only after threat of penalty." The record undermines plaintiffs' assertion they were ready to participate in the ERISA process since January 15, 2003, as plaintiffs clearly pursued state law claims including "breach of contract" and did not stipulate to ERISA preemption until May 16, 2005 [Doc. 29], more than two years after plaintiffs filed their breach of contract claim. Likewise, the record establishes Aetna was not "invoked by Aetna only after threat of penalty" insofar as Aetna affirmatively pled ERISA preemption in its Answers to the original and supplemental petitions as early as 2003; however, plaintiffs continued to pursue their state law breach of contract claims rather than proceed under ERISA.

Thereafter, the record contains no "demand" for benefits under ERISA until plaintiffs' August 24, 2005 demand.[48]  Pursuant to that request, Aetna again provided a written explanation with respect to its decision regarding the payment of benefits under the Aetna policy.  Aetna's response to the "demand" adequately notified plaintiffs in writing that their claim for benefits under the plan was denied, and clearly set forth the specific reasons for the denial, written in a manner calculated to be understood by the plaintiffs. Likewise, Aetna afforded a reasonable opportunity to plaintiffs, whose claim for benefits has been denied, for a full and fair review by Aetna, the appropriate named fiduciary, of the decision denying the claim.[49]

Accordingly, this Court would find insufficient evidentiary support for plaintiffs' argument that Aetna's behavior was "arbitrary and capricious" as a result of its responses to the three letters

---

[48]  Plaintiffs argue they submitted a June 23, 2005 demand under ERISA, but that demand was "inadvertently omitted" from the Administrative Record. There is a reference to a June 23, 2005 "demand" in plaintiffs' August 24, 2005 correspondence; however, a copy of the June 23, 2005 is not of record.

[49]  There is no argument nor any evidence that Aetna violated its fiduciary obligation to Oxy under the plan when it paid Mrs. Martha Ableson benefits upon the death of Mr. Ableson.

-29-

of correspondence. Rather, substantial evidence in the record establishes Aetna responded timely in writing to letters sent by counsel for plaintiffs and that Aetna responded properly to the eventual ERISA demand. Thus, this Court would find Aetna's decision was not an abuse of discretion in consideration of regulations formulated by the appropriate administrative agencies.

### C.    The Factual Background of the Determination

The factual background of this matter reveals no evidence of an abuse of Aetna's discretion. Rather, the factual background, as contained in the administrative record, contains substantial evidence supporting a conclusion Aetna's decision was not an abuse of discretion, as noted above and for the reasons that follow.

The administrative record reveals Aetna became involved in this matter when Oxy acquired Cities and replaced the Cities group plan, which was insured by Equitable policies 7072 and 7072D, with the Oxy Plan, which was insured through Aetna policy 397390. Under the Oxy Plan, Aetna has unquestionable discretionary authority to interpret terms of the plan and to determine eligibility for benefits and coverage. The Administrative Record clearly contains language indicating the Aetna Policy "supercedes and replaces any prior coverage."

Before Aetna became involved, Mr. Ableson executed the 1978 Equitable assignment of his interests in the Equitable policies 7072 and 7072D to his wife, who died shortly thereafter. Equitable apparently became notified of Mrs. Ableson's death and that her interest in the assignment was "divided" by the "state" equally between Mr. Ableson and the Ableson daughters, who reportedly desired to giver their interest back to their father. Equitable unquestionably requested that a "reassignment form" be executed, but a review of the record reveals no such form was in fact executed. There is no evidence such a reassignment form was ever completed. Aetna discussed this

-30-

information with plaintiffs in its decisions denying benefits; however, plaintiffs have apparently not responded to Aetna's discussion of this information, nor have plaintiffs presented any explanation, argument or objection to this information before this Court.

In 1986, Aetna issued its letter to Oxy indicating its concerns with the Equitable Assignments and its explanation of alternatives employees should consider. As noted above, one of the principal goals of ERISA is to enable employers to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits. *Egelhoff,* 532 U.S. at 148. Likewise, one of the underlying principles of ERISA is to ensure that employee benefits are given as promised and as expected. *High, supra* at 566-567. Here, it appears Aetna was committed to these principles as evidenced in the 1986 letter in which it set forth alternatives for employees to follow to accommodate their assignments and to pay their intended beneficiaries.

Mr. Ableson unquestionably chose to execute a designation of beneficiaries on May 14, 2001, when he expressed his intent and expectation that Mrs. Ableson be paid upon his death. Aetna unquestionably paid in full the benefits payable upon Mr. Ableson's death pursuant to the clear and unambiguous terms of his May 14, 2001 change of beneficiaries and pursuant to the clear and unambiguous terms of the plan. Based on the substantial evidence contained in the record supporting Aetna's decision, this Court cannot say Aetna abused the discretion with which it was authorized to determine eligibility for benefits and coverage and to interpret the terms of the plan.

### D.     Any Inferences of Lack of Good Faith.

As to bad faith, this Court has been presented with no evidence Aetna acted in bad faith when it made its decision in this matter. In 1986, it clearly expressed its concern over the language used in the Equitable Assignments and provided alternatives for the employees to follow to comport with

the terms of the plan.  Aetna unequivocally indicated it would honor assignments submitted on Aetna's forms, and plaintiffs have presented no evidence that Aetna at any point did not honor assignments submitted on Aetna's forms.  Additionally, Aetna clearly expressed thoughtful consideration of the employees' interests under the Internal Revenue Code.  Thereafter, there is no indication Aetna acted in nonconformity with its 1986 decision at any time after 1986.

On the other hand, there is substantial evidence indicating Mr. Ableson executed the designation of beneficiaries in favor of Mrs. Ableson.  Although plaintiffs believe they should have been paid, there is no dispute Aetna never contested coverage and actually paid the full amount of benefits payable to the designated beneficiary under the plan.  Plaintiffs have suggested Aetna lacked authority to make the decision that the 1978 Equitable Assignment form was not binding under the Oxy Plan insured by Aetna; however, their argument is undermined by their admission Aetna was vested with discretionary authority to determine eligibility for coverage and benefits as well as to interpret the terms of the plan.  Accordingly, this Court finds no evidence of any bad faith on the part of Aetna in its decision to pay Mrs. Ableson the benefits pursuant to Mr. Ableson's designation of beneficiaries and pursuant to the clear and unambiguous terms of the plan.

In view of the foregoing, this Court finds: (1) there is no internal inconsistency of the Plan under Aetna's Interpretation; (2) Aetna's interpretation is not inappropriate under regulations formulated by the appropriate administrative agencies; and (3) Aetna's determination is appropriate in consideration of the factual background of its determination; and (4) there are no inferences of Aetna's lack of good faith.  Accordingly, this Court would find Aetna's decision not to have been an abuse of its undisputed discretion under the Plan.

**CONCLUSION**

For the foregoing reasons, this Court finds the interpretation of the plan, not to have been incorrect.   Accordingly, plaintiffs' claim against AETNA is hereby **DISMISSED WITH PREJUDICE**.

THUS DONE AND SIGNED in Chambers, in Lafayette, Louisiana, this ___ day of May, 2007.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE